ALICIA A.G. LIMTIACO
United States Attorney
ROSETTA L. SAN NICOLAS
Assistant U.S. Attorney
Suite 500, Sirena Plaza
108 Hernan Cortez Avenue
Hagåtña, Guam 96910-5009
TEL: (671) 472-7332
FAX: (671) 472-7334

Attorneys for the United States of America

FILED
DISTRICT COURT OF GUAM
MAR 28 2013
JEANNE G. QUINATA
CLERK OF COURT

FILED
DISTRICT COURT OF GUAM
MAR 26 2013
JEANNE G. QUINATA
CLERK OF COURT

19

IN THE UNITED STATES DISTRICT COURT

FOR THE TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>vs.<br><br>RAMACHANDRAN VADIVELLU aka VIC RAAMA aka VIC RAAMA SARADA,<br>Defendant. | CRIMINAL CASE NO. 12-00055<br><br>AMENDED<br>**PLEA AGREEMENT** |

Pursuant to Rule 11(c)(1)(B), the United States and the defendant, RAMACHANDRAN VADIVELLU aka VIC RAAMA aka VIC RAAMA SARADA, enter into the following plea agreement:

1. The defendant agrees to waive Indictment pursuant to Federal Criminal Procedure Rule 7(b), and enter a guilty plea to an Information charging him with Mail Fraud, in violation of Title 18 United States Code Sections 1341 and 2 (Count I), Visa Fraud, in violation of 18 United States Code, Sections 1546(a) and 2 (Counts II-IV), Conspiracy to Commit Money Laundering, in violation of Title 18, United States Code, Sections 371 and 2 (Count V).

2(a). The defendant understands that the <u>maximum</u> sentence for Mail Fraud in violation of Title 18, United States Code, Section 1341 is a term of twenty (20) years imprisonment, a $250,000 fine, and a $100 special assessment fee, which must be paid at the time of sentencing as

well as such restitution as the Court may order. Any sentence imposed shall include a term of supervised release of not more than three years in addition to such term of imprisonment. Defendant understands that if he violates a condition of supervised release at any time prior to the expiration of such term, for each count, the Court may revoke the term of supervised release and sentence him to not more than an additional two years of incarceration pursuant to 18 U.S.C. § 3583(e)(3).

2(b). The defendant understands that the <u>maximum</u> sentence for Visa Fraud in violation of Title 18, United States Code, Section 1546(a) is a term of ten (10) years imprisonment, a $250,000 fine, and a $100 special assessment fee, which must be paid at the time of sentencing as well as such restitution as the Court may order. Any sentence imposed shall include a term of supervised release of not more than three years in addition to such term of imprisonment. Defendant understands that if he violates a condition of supervised release at any time prior to the expiration of such term, for each count, the Court may revoke the term of supervised release and sentence him to not more than an additional two years of incarceration pursuant to 18 U.S.C. § 3583(e)(3).

2( c). The defendant understands that the <u>maximum</u> sentence for Conspiracy to Commit Money Laundering in violation of Title 18, United States Code, Section 371 is a term of five (5) years imprisonment, a $250,000 fine, or in the alternative not more than twice the amount of the criminally derived property involved in the transaction, and a $100 special assessment fee, which must be paid at the time of sentencing as well as such restitution as the Court may order. Any sentence imposed shall include a term of supervised release of not more than three years in addition to such term of imprisonment. Defendant understands that if he violates a condition of supervised release at any time prior to the expiration of such term, the Court may revoke the term of supervised release and sentence him to not more than an additional two years of incarceration pursuant to 18 U.S.C. § 3583(e)(3).

//

//

2(d). The defendant will be required to pay an assessment fee of $100, for each count, which is due and payable at the time of sentencing pursuant to 18 U.S.C. § 3013. The defendant agrees to deliver a check or money order to the Clerk of Court in the amount of $500, payable to the U.S. District Court at the time of his sentencing.

2(e). Defendant RAMACHANDRAN VADIVELLU aka VICRAAMA SARADA aka VIC RAMA agrees to forfeit to the United States of America any property real or personal that constitutes or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of the offenses of conviction, as follows:

(1) U.S. currency in the amount of $14,848.20, check Number 8730

(2) U.S. currency in the amount of $16,180.00, check Number 8899

(3) U.S. currency in the amount of $10,675.00, check Number 10071

(4) U.S. currency in the amount of $9,475.00, check Number 10072

(5) Time Certificate of Deposit No. 7003067554 in the amount of $24,000.00 and interest (Wage Bond)

(6) Time Certificate of Deposit No. 7003067559 in the amount of $10,313.00 and interest (Repatriation Bond)

The defendant agrees to pay restitution for the unpaid wages owed to the H-2B workers employed for TRANSRAMA GUAM, INC. in an amount to be determined by the court at sentencing. In addition, the defendant agrees to pay restitution to the Internal Revenue Service for unpaid Social Security and Medicare taxes in an amount to be determined by the court at sentencing.

2(f). The government will recommend a fine within the Sentencing Guidelines range. The defendant understands and agrees that, pursuant to 18 U.S.C. § 3613, whatever monetary penalties are imposed by the Court will be due and payable immediately and subject to immediate enforcement by the United States as provided for in Section 3613. The defendant agrees not to dissipate assets. Furthermore, the defendant agrees to provide all of his financial information to the United States and the Probation Office and, if requested, to participate in a pre-sentencing debtor's examination. If the Court imposes a schedule of payments, the defendant understands

that the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the Court specifically directs participation or imposes a schedule of payments.

Defendant agrees to make a full pre-sentence disclosure of his financial status to the United States Attorney's Office by completing a Financial Disclosure Form (OBD-500) and releases for the purpose of determining his ability to pay any Court-imposed monetary penalties. Defendant agrees to complete and return Form OBD-500 within three (3) weeks of execution of this plea agreement. If defendant is financially unable to immediately pay the monetary penalties in full, the defendant agrees (i) to cooperate with the Financial Litigation Unit of the United States Attorney's Office, (ii) to provide updated OBD-500 forms upon request by the United States Attorney's Office, (iii) to keep the Financial Litigation Unit advised about the defendant's current address, (iv) for his debt to be placed on the Treasury Offset Program which will offset any federal funds he is or will be entitled to as permitted by law, and (v) for his debt to be placed on any tax refund/rebate offset program existing in his state of residency. Defendant understands that any funds captured by the Treasury Offset Program or a state's tax refund/rebate offset program will be paid towards his monetary penalties and does not relieve him of his obligation to pay the monetary penalties in full. Defendant understands that, by law, interest accrues on any remaining balance of the debt.

3. The defendant, RAMACHANDRAN VADIVELLU aka VIC RAAMA aka VIC RAAMA SARADA, understands and agrees to surrender to the United States or any lawful agency as may be directed by the Court any and all assets or portions thereof acquired or obtained by him as a direct or indirect result of any criminal activity, including but not limited to the offenses described in this agreement. The assets to be surrendered include, but are not limited to, cash, stocks, bonds, certificates of deposit, personal property and real property.

4. The defendant, RAMACHANDRAN VADIVELLU aka VIC RAAMA aka VIC

RAAMA SARADA, further agrees to submit to a polygraph examination by any qualified Federal polygraph examiner. The defendant understands that such polygraph examination may include, but will not be limited to, his knowledge of or involvement in fraud, money laundering and other related offenses and his knowledge of other person's involvement in such activities. Defendant understands that the government will rely on the polygraph in assessing whether he has been fully truthful.

5(a). The defendant, RAMACHANDRAN VADIVELLU aka VIC RAAMA aka VIC RAAMA SARADA, further agrees to fully and truthfully cooperate with Federal law enforcement agents concerning their investigation of fraud and money laundering and other related offenses. The defendant understands and agrees that complete and truthful cooperation is a material condition of this agreement. Cooperation shall include providing all information known to the defendant regarding any criminal activity, including but not limited to the offense to which he is pleading guilty. Cooperation will also include complying with all reasonable instructions from the United States; submitting to interviews by investigators and attorneys at such times and places to be determined by counsel and/or investigators for the United States; producing to the United States all non-privileged documents (including claimed personal documents) and other materials in the possession, custody or control of the defendant requested by attorneys and agents of the United States; and, testifying fully and truthfully before any grand juries, hearings, trials or any other proceedings where the defendant's testimony is deemed by the United States to be relevant. Defendant understands that such cooperation shall be provided to any state, local and federal law enforcement agencies designated by counsel for the United States. Further, it is understood and agreed that the defendant shall not directly, indirectly, or intentionally disclose anything defendant knows or has done concerning the government's investigation to anyone other than defendant's attorney. Defendant agrees to take no steps directly or indirectly to "tip" or warn any subject of this investigation that defendant, subject or anyone else is being investigated.

The United States agrees that any statements made by the defendant during the cooperation phase of this agreement shall not be used against the defendant in any subsequent

prosecution unless the defendant has breached this agreement.

5(b). The United States will make this cooperation known to the Court prior to the defendant's sentencing. The defendant further understands that he remains liable and subject to prosecution for any criminal schemes of which he does not fully advise the United States, or for any material omissions in this regard.

5(c). Except as otherwise herein provided, and in particular Paragraph 11, the United States agrees not to prosecute defendant for any other non-violent offenses which were committed in the Districts of Guam or the Northern Mariana Islands which defendant reveals to Federal authorities during his cooperation with the United States. This agreement is limited to crimes committed by defendant in the Districts of Guam or the Northern Mariana Islands.

5(d). If defendant cooperates as set forth in this agreement, the government will recommend that defendant receives the statutory mandatory minimum, if any, under the applicable statutes, or the minimum term of incarceration recommended by the Sentencing Guidelines, whichever is greater. If defendant does not fully cooperate as set forth in this agreement, the government will recommend whatever sentence of incarceration within the Guidelines range it may deem appropriate.

5(e). If the United States determines, in its sole discretion, that the defendant has provided "substantial assistance" pursuant to U.S.S.G. § 5K1.1 and Title 18, United States Code, Section 3553(e), the United States will request the Court to depart below the guideline range or the statutory mandatory minimum, if applicable, to whatever guideline range or sentence of incarceration the United States, in its sole discretion, deems appropriate or may, within one year after sentencing herein, move the Court to order relief pursuant to Federal Rule of Criminal Procedure 35, to whatever guideline range or sentence of incarceration the United States in its sole discretion deems appropriate. Defendant acknowledges that the substantial assistance determination is solely up to the United States Attorney's Office and that the United States has made no promise, implied or otherwise, that defendant will be granted a "departure" for "substantial assistance."

The United States agrees to consider the totality of the circumstances, as they relate to the following factors, in determining whether defendant has provided "substantial assistance" which would merit a government request for a downward departure from the applicable guideline sentencing range:

(1) the United States' evaluation of the significance and usefulness of any assistance rendered by defendant;

(2) the truthfulness, completeness and reliability of any information or testimony provided by defendant;

(3) the nature and extent of defendant's assistance;

(4) any injuries suffered or any danger or risk of injury to defendant or defendant's family resulting from any assistance provided by defendant; and

(5) the timeliness of any assistance provided by defendant.

It is understood that even if a motion for departure is made by the United States, based upon defendant's perceived "substantial assistance," the final decision as to how much, if any, reduction in sentence is warranted because of that assistance, rests solely with the Court.

6(a). The defendant understands that to establish the offense of Mail Fraud, a violation of Title 18, United States Code, Sections 1341, the government must prove each of the following elements beyond a reasonable doubt:

First: the defendant knowingly devised a scheme to defraud;

Second: the statements made as a part of the scheme were material, that is, they had a natural tendency to influence; ~~or were capable of influencing, a person to part with property;~~

Third: the defendant acted with the intent to defraud, that is, the intent to deceive or cheat; and

Fourth: the defendant used or caused to be used, the mails to carry out or attempt to carry out an essential part of the scheme.

6(b). The defendant understands that to establish a violation of Visa Fraud perjury as charged pursuant to 18 U.S.C. Section 1546, the government must prove each of the following elements beyond a reasonable doubt:

First: the defendant subscribed as true a false statement. ~~under oath;~~

Second: the defendant acted with knowledge that the statement was untrue;

> Third: the statement was material to the activities or decisions before the Citizen and Immigration Service, that is, had a natural tendency to influence, or was capable of influencing the agency's decisions or activities;
>
> Fourth: the statement was made under penalty of perjury; and
>
> Fifth: the statement was made on an application required by immigration laws or regulations.

6( c). The defendant understands that to establish a violation of Conspiracy to Commit Money Laundering, pursuant to 18 U.S.C. Section 371, the government must prove each of the following elements beyond a reasonable doubt:

> First: beginning on or about July, 2008, and continuing thereafter up to and including September 15, 2010, there was an agreement between two or more persons to commit the offense of money laundering, as defined in 18 U.S.C. Section 1957;
>
> Second: the defendant ~~joined in the agreement knowing of its purpose and intending to help accomplish that purpose.~~ he became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.
>
> Third: One of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

7. The defendant agrees that the Sentencing Guidelines apply to this offense. The defendant also understands that the facts he stipulates to herein will be used, pursuant to § 1B1.2 of the Sentencing Guidelines, in calculating the applicable guidelines level.

Further, if the defendant cooperates with the United States by providing information concerning the unlawful activities of others, the government agrees that any self-incriminating information so provided will not be used against defendant in assessing his punishment, and therefore, pursuant to § 1B1.8(a) of the Sentencing Guidelines, this information should not be used in determining the applicable guidelines range.

The defendant understands that notwithstanding any agreement of the parties, the United States Probation Office will make an independent application of the Sentencing Guidelines. The defendant acknowledges that should there be discrepancies in the final sentencing guidelines' range projected by his counsel or any other person, such discrepancy is not a basis to withdraw his guilty plea. Pursuant to Federal Rule of Criminal Procedure 11(c)(3)(B), the defendant also understands that if the Court does not accept the sentencing recommendation made by the United States to the Court pursuant to Rule 11(c)(1)(B), the defendant nevertheless has no right to

withdraw his guilty plea.

8. The government and the defendant stipulate and agree to the following facts for purposes of the Sentencing Guidelines and that the Sentencing Guidelines range shall be determined solely from the facts set forth herein, to wit:

(a) The defendant was born in 1958 and is a naturalized citizen of the United States.

(b) Defendant RAMACHANDRAN VADIVELLU aka VIC RAAMA aka VIC RAAMA SARADA incorporated Transrama Guam, Inc., a registered Guam corporation on August 25, 1993. From its incorporation until it ceased doing business in June, 2010, defendant acted as the general manager of Transrama Guam, Inc. and was responsible for its day to day operations.

Under United States laws and regulations, non-citizens of the United States (aliens) are not permitted to work in the United States unless they obtain employment authorization from the United States Government, in particular, the U.S. Department of Labor and the U.S. Department of Homeland Security, Citizenship and Immigration Service (USCIS). An employer seeking the admission of such a worker could secure a H2-B Visa for the worker if the employer was able to demonstrate that there were no qualified United States workers to perform the job and that hiring an alien worker would not adversely affect local wages. The H-2B visa permitted aliens to work in the United States for a specified, temporary period of time, typically one year.

An employer who desired to bring alien workers to Guam first was required to apply for a temporary labor certification from the Governor of Guam. By regulation, Guam had determined certain prevailing wage rates and working conditions which applied to all workers on Guam. The prevailing wage rate in Guam for heavy equipment mechanics is $14.14 per hour for a 40 hour week and $21.21for overtime. The prevailing wage for carpenters was $13.56 per hour for a 40 hour week and $20.34 for overtime. In addition, the Guam Department of Labor (GDOL) prohibited the employer from charging more than $320/month for room and board. At the time the employer submitted the Application for Temporary Alien Labor Certification, he was required to swear under penalty of perjury that, after the alien began to work, he would pay a wage that equaled or exceeded the prevailing wage which was applicable at the time the alien began work.

The GDOL was the Government of Guam agency designed to regulate the alien labor certification process, and to handle all administrative and disciplinary matters related to the applications for and the processing of labor certifications. Labor certifications from the Governor of Guam were necessary to obtain H-2B visas from USCIS. An employer seeking to employ temporary foreign employees was required to file an Application for Temporary alien Certification (GDOL 750 application) with the GDOL. The employer was required to provide, among other things, the employer's name, address, where the aliens would work, the jobs being offered, the rate of pay, the overtime rate of pay, the qualifications required of the prospective alien employee, the number of openings to be filled by the aliens and the dates of expected employment. The employer was required to sign the GDOL 750 Application under penalty of perjury. If the Director of the GDOL approved the Application, it was forwarded to the Governor of Guam for review and approval. If the Governor approved and signed the GDOL 750 Application, it was then issued to the employer. The workers ultimately brought into Guam pursuant to the GDOL 750 Application were only to be employed on the projects listed in that Application, and only for the employer who filed that Application.

Once he had secured approval from the Governor of Guam, the employer was required to submit an I-129 Petition for a Nonimmigrant Worker (I-129) to the USCIS to obtain H-2B visas for prospective employees. The I-129 Petition required the employer to identify the type of business in which he was engaged, to list the number of H-2B visas he desired USCIS to issue, the names and dates of birth for each worker, his citizenship, his job title, the wages each worker would be paid per week, and the dates of intended employment. The employer was required to sign the I-129 Petition under penalty of perjury, as provided by 28 U.S.C. § 1746. If more than one H-2B visa was requested, the employer provided the information concerning the additional workers on a form I-129 Supplement H. The employer was also required to attach to the I-129 Petition the original GDOL 750 Application and supporting documents which had been submitted to the GDOL, and the approval issued by the Governor.

This I-129 Petition and its supporting documentation is to be mailed to the USCIS Service

Center in Laguna Niguel, California (California Service Center), or to St. Albans in Vermont (Vermont Service Center.) If the USCIS approved the employer's I-129 Petition, a USCIS employee would note the approval on the original I-129 Petition and designate the number of H-2B temporary foreign worker positions approved on the I-129 Petition. As well, the USCIS employee would generate a Notice of Action (I-797), mail a copy to the employer and a copy to the appropriate United States Embassy. The time period for which the approved I-129 Petition is valid is noted on the face of the I-797 form.

Aliens seeking to enter the United States as H-2B temporary workers are required to complete a form DS-156 Nonimmigrant Visa Application to the United States Embassy or the United States Consulate. When the appropriate embassy or consulate received the approved I-797 from the USCIS, the visa would be prepared at the embassy, and the dates of validity would be printed on the face of the visa. Once the alien received an H-2B visa, the alien was permitted to apply to enter the United States and work for the petitioning employer. Typically, the alien would apply for admission at a United States port of entry by completing and submitting a two-part Form I-94 Arrival/Departure document. After inspection, if a Customs and Border Protection (CBP) officer determined that the alien is admissible, an annotation would be made in the alien's passport and on the I-94 indicating the date of entry and the date the admission expires. The departure portion of the I-94 form would be attached to the alien's passport, and the arrival portion was forwarded for processing by CBP.

Upon entry to Guam, the employer was required to register the alien worker with the Alien Labor Processing Certification Division (ALPCD) of the GDOL within 24 hours by bringing the H-2B worker to the GDOL and filing an Application for a Temporary Non-Immigrant card, called an H-2 ID card. The GDOL required copies of the workers' passports, employment contracts, and the approval from USCI to be attached to each application. If approved, the GDOL would register each H-2B worker, photograph him, and issue an H-2 ID card.

The employment of H-2B workers was limited to the job description and projects designated on the I-129 Petition, and limited to working for the company which had submitted the

GDOL 750 Application and the I-129 Petition on their behalf. The GDOL required the employer monthly to submit an "Employer's Workplace Monthly Report," detailing the number of United States workers and H-2B workers employed that month. The employer was also required to submit an "H-2B Workforce Data" sheet, listing each H-2B employee, his arrival date, his GDOL identification number, the expiration date of his H-2B visa, his Social Security number, his hourly rate of pay, and the monthly deductions taken from his wages.

When the worker was ready to depart Guam, the employer was required to file with the GDOL an Application for Exit Clearance, notifying the GDOL that the listed worker was scheduled to depart Guam. The employer was required to attach an Affidavit to said GDOL Application swearing that all wages and other compensation due the worker had been paid. Upon the worker's departure, the employer was required to file with the GDOL, a Notification of Departure, listing the names, occupations, the GDOL ID numbers, dates of departure, airline flight numbers and ticket numbers of each departing worker.

An alien's H-2B status was only valid until the date annotated on his I-94 form. Each worker was required to depart the United States before the expiration date indicated on his I-94 forms. If the employer desired to extend a worker's H-2B immigration status, he could file another I-129 Petition for a Nonimmigrant Worker, requesting an extension of that worker's H-2B immigration status for a designated period of time. The employer was required to provide the names, dates of birth, addresses in the United States, Social Security numbers, type of work the employees were performing, and wages the employees were receiving, for each individual worker. The employer was required to mail said Petition and its supporting documentation to a USCIS Service Center for processing. If said Petition was approved, the workers were required to re-register with the GDOL and receive new GDOL ID cards.

If an alien who was granted an H-2B visa entered the United States but did not work for the petitioning company, that alien was out of status and was in violation of the immigration laws and was subject to deportation and possible criminal prosecution. Before the alien could work for another company, that company was required to file an I-129 Petition for a Nonimmigrant worker

to change employers with the USCIS, and that change of employers had to be approved by the USCIS. If the alien worked for another company without such approval, that alien was likewise out of status, in violation of the immigration laws, and subject to deportation and possible criminal prosecution. It was illegal for any person to employ an alien who remained in the United states illegally.

Beginning on or about December, 2008, and continuing through July 31, 2010, the defendant devised a scheme and artifice to defraud the United States. The purpose of the scheme was unlawfully to enrich the defendant by securing H-2B visas for aliens to come to Guam to work on Transrama Guam, Inc.'s construction projects at wages that were significantly below the Guam prevailing wage rates. To further that scheme, defendant submitted the GDOL 750 applications to the GDOL, representing therein that he intended to employ the number of aliens listed in each GDOL-750 application as construction workers for Transrama Guam, Inc. on specific projects identified in the GDOL-750 Application, and representing further that he would pay each of these workers the weekly and hourly Guam prevailing wage.

Once the Governor of Guam approved the issuance of H-2B visas, it was further part of the scheme to defraud that defendant mailed I-129 Petitions, and falsely represented on these I-129 Petitions that the listed aliens would be paid the Guam prevailing hourly wage for that occupation.

It was further part of the scheme to defraud that after the H-2B workers began working for Transrama Guam, Inc., defendant paid them an illegal wage, approximately $2 to $6 per hour, and illegally charged them $100.00 which was deducted from the wages the defendant owed them.

It was further part of the scheme to defraud that defendant would unlawfully lend his workers to another company, and charge that company for the labor of Transrama Guam, Inc. employees. It was further part of the scheme to defraud that defendant refused to pay Transrama Guam, Inc. workers the wages they were entitled to receive for the work they had performed on Transrama Guam, Inc. projects, and on projects belonging to other contractors.

It was further part of the scheme to defraud that defendant submitted GDOL Employer's

Workplace Monthly Reports certifying that he was paying the H-2B workers in his employ Guam's prevailing hourly wage set for that worker's listed occupation.

It was further part of the scheme to defraud that defendant caused his office workers to print checks in the name of the Transrama Guam, Inc. H-2B worker, reflecting the amount of legal wages owed them. Defendant would have the employees sign the reverse side of the check, however never gave these checks to the workers.

It was further part of the scheme to defraud that the monies defendant received from Transrama Guam, Inc. projects and by illegally lending Transrama Guam, Inc. workers to other companies were deposited into account(s) in the Bank of Hawaii, and used to pay Transrama Guam, Inc. workers illegal wages in cash.

During the course of executing this scheme, defendant sent and caused to be sent I-129 Petitions for approximately ten (10) H-2B workers, defendant sent these I-129 Petitions by U.S. Mail and commercial carrier as follows:

- an I-129 Petition for a Nomimmigrant Worker requesting H-2B visas for Four (4) Heavy Equipment Mechanics, mailed on July 6, 2009;

- an I-129 Petition for a Nomimmigrant Worker requesting H-2B visas for Four (4) Carpenters, mailed on July 6, 2009; and

- an I-129 Petition for a Nomimmigrant Worker requesting H-2B visas for Two (2) Carpenters, mailed on July 6, 2009;

In each of the above-listed I-129 Petitions, defendant willfully and knowingly subscribed as true, as permitted under Section 1746 of Title 28, that he intended to, or was already, paying each of the listed aliens Guam's prevailing wage, set by their listed occupation. These statements were material to whether USCIS would approve the issuance of the H-2B defendant was requesting. Defendant knew these statements were false, he paid each alien between $2 to $6 per hour; he paid no overtime; he caused each alien to work at least 40 hours/week, and he loaned the aliens to work for another company.

The monies defendant received from Transrama Guam, Inc. projects were the product of mail and visa fraud, as stated above, because defendant had secured the H-2B visas for his

workers by willfully and knowingly, under penalty of perjury, swearing that Transrama Guam, Inc. workers would be paid Guam's prevailing wage rates, when defendant knew these statements were false. In fact, defendant had previously entered into a contract with the Transrama Guam, Inc. workers agreeing to pay the aliens between $2 to $6 per hour. Defendant created another contract with the Transrama Guam, Inc. workers which purported to pay the aliens the prevailing wage rate for heavy equipment operators $14.14 and carpenters $13.56.

Defendant conducted the following monetary transactions, which affected interstate commerce, through the financial institutions listed below, knowing portions of these monetary transactions concerned the proceeds of visa and mail fraud:

- on January 8, 2010, deposited $14,516.60 into the Bank of Hawaii TRANSRAMA GUAM, INC. Account;

-on January 19, 2010 deposited $14,602.00 into the Bank of Hawaii TRANSRAMA GUAM, INC. Account;

-on January 27, 2010 deposited $23,113.00 into the Bank of Hawaii TRANSRAMA GUAM, INC. Account;

_on February 9, 2010 deposited $10,350.00 into the Bank of Hawaii TRANSRAMA GUAM, INC. Account;

-on February 16, 2010 converted $27,504.00 Payment into a Cashier's Check from Citibank and then deposited $27,494.00 into the Bank of Hawaii TRANSRAMA GUAM, INC. Account;

-on March 3, 2010 converted $27,277.50 Payment into a Cashier's Check from Citibank and then deposited $27,277.50 into the Bank of Hawaii TRANSRAMA GUAM, INC. Account;

-on March 24, 2010 deposited $23,452.50 into the Bank of Hawaii TRANSRAMA GUAM, INC. Account;

-on March 25, 2010 deposited $10,550.00 into the Bank of Hawaii TRANSRAMA GUAM, INC. Account;

-on April 13, 2010 deposited $11,175.00 into the Bank of Hawaii TRANSRAMA GUAM, INC. Account;

-on April 14, 2010 converted $24,462.50 Payment into a Cashier's Check from Citibank and then deposited $24,462.50 into the Bank of Hawaii TRANSRAMA GUAM, INC. Account;

-on May 17, 2010 deposited $10,110.00 into the Bank of Hawaii TRANSRAMA GUAM, INC. Account;

-on May 5, 2010 converted $26,390.60 Payment into a Cashier's Check from Citibank and then deposited $26,390.60 into the Bank of Hawaii TRANSRAMA GUAM, INC. Account;

-on June 8, 2010 converted Two Payments of $13,277.50 and $7,050.00 into a Cashier's Check from Citibank and then Deposited $20,327.50 into the Bank of Hawaii TRANSRAMA GUAM, INC. Account;

-on February 22, 2010, deposited $1,520.00 into the Bank of Hawaii TRANSRAMA GUAM, INC. Account;

-on March 24, 2010, deposited $7,100.00 into the Bank of Hawaii TRANSRAMA GUAM, INC. Account;

-on June 14, 2010, deposited $7,250.00 into the Bank of Hawaii TRANSRAMA GUAM, INC. Account; and

-on August 6, 2010, deposited $6,800.00 into the Bank of Hawaii TRANSRAMA GUAM, INC. Account.

The total amount of monies involved in these transfers was approximately $266,501.20.

9. The defendant understands that this plea agreement depends on the fullness and truthfulness of his cooperation. Therefore, defendant understands and agrees that if he should fail to fulfill completely each and every one of his obligations under this plea agreement, or make material omissions or intentional misstatements or engage in criminal conduct after the entry of his plea agreement and before sentencing, the government will be free from its obligations under the plea agreement; thus defendant, in addition to standing guilty of the matters to which he has pled pursuant to this agreement, shall also be fully subject to criminal prosecution for other crimes, and for the counts which were to be dismissed. In any such prosecution, the prosecuting authorities, whether federal, state or local, shall be free to use against him, without limitation, any and all information, in whatever form, that he has provided pursuant to this plea agreement or otherwise; defendant shall not assert any claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other provision of law, to attempt to bar such use of the information.

10. Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense(s) to which defendant is pleading guilty.

Removal and other immigration consequences are the subject of a separate proceeding, however, and defendant understands that no one, including his attorney or the Court, can predict to a certainty the effect of his conviction on his immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is his automatic removal from the United States. The defendant further understands that removal and other unanticipated collateral consequences will not serve as a ground for withdrawing a guilty plea.

11. In exchange for the government's concessions in this plea agreement, the defendant voluntarily, knowingly and intelligently waives any right to appeal or to collaterally attack any aspect of the defendant's conviction including, but not limited to, any pretrial dispositions of motions and other issues. Defendant acknowledges and agrees that this waiver shall result in the dismissal of any appeal or collateral attack the defendant might file challenging his conviction in this case. Defendant reserves the right to appeal the sentence actually imposed in this case. The defendant understands and agrees that the government has bargained for a criminal conviction arising from his criminal conduct. If at any time defendant's guilty plea or conviction is rejected, withdrawn, vacated or reversed, for whatever reason, or is rendered invalid for any reason, or if any change of law renders the conduct for which he was convicted to be non-criminal, defendant agrees that he will enter a guilty plea to another charge encompassing the same or similar conduct. In such event, defendant waives any objections, motions or defenses based upon the Statute of Limitations, Speedy Trial Act or constitutional restrictions as to the time of bringing such charges.

12. In the event that the United States believes the defendant has failed to fulfill any obligations under this agreement, or has falsely implicated an innocent person in the commission of a crime, then the United States shall, in its discretion, have the option of declaring any provision of this agreement or of its obligations herein null and void, in which event or events the defendant shall not be entitled to withdraw the plea of guilty made in connection with this plea agreement. Whether or not the defendant has completely fulfilled all of the obligations under this agreement shall be determined by the Court in an appropriate proceeding at which any disclosures

and documents provided by the defendant shall be admissible and at which the United States shall be required to establish any breach by a preponderance of the evidence. In order to establish any breach by the defendant, the United States is entitled to rely on statements and evidence given by the defendant during the cooperation phase of this agreement. In determining whether there has been a breach, the parties agree that any polygraph results and the polygrapher's conclusions and opinions shall be admissible.

13. Nothing in this agreement shall protect the defendant in any way from prosecution for any offense committed after the date of this agreement. Should the defendant be charged with any offense alleged to have occurred after the date of this agreement, the information and documents disclosed to the United States during the course of the cooperation could be used against the defendant in any such prosecution.

14. The defendant understands that his sentencing may be continued, at the discretion of the United States, until after the indictment and trial of any associates involved. This will also enable the Court to determine the full degree of the defendant's cooperation. The defendant therefore waives any right he may have to any speedy sentencing and hereby agrees to any continuance of his sentencing date as it may become necessary.

15. Nothing in this agreement shall bind any other federal, state or local districts, jurisdiction or law enforcement agency other than the United States Attorney for the Districts of Guam and the Northern Mariana Islands.

16. The defendant understands that he may be subject to administrative action by federal or territorial agencies other than the United States Attorney for the Districts of Guam and the Northern Mariana Islands as a result of the guilty plea entered pursuant hereto, and this plea agreement in no way limits the action, if any, other agencies may take. In addition, the defendant understands that he may be subject to civil and equitable claims, demands or causes of action by the United States and others, and that this plea agreement in no way affects these claims, demands or causes of action.

17. This agreement is not contingent in any way upon the outcome of any investigation,

proceeding or subsequent trial. Thus, none of the rights and obligations described above are in any way dependent upon a grand jury returning an indictment, a jury's verdict at any trial or the success of any prosecution.

18. The defendant acknowledges that he has been advised of his rights as set forth below prior to entering into this plea agreement. Specifically, defendant has been fully advised of, has had sufficient opportunity to reflect upon, and understands the following:

(a) the nature and elements of the charges and the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law;

(b) his right to be represented by an attorney;

( c) his right to plead not guilty and the right to be tried by a jury and at that trial, the right to be represented by counsel, the right to confront and cross-examine witnesses against him, and the right not to be compelled to incriminate himself, that is, the right not to testify;

(d) that if he pleads guilty, there will not be a further trial of any kind on the charges to which such plea is entered so that by entering into this plea agreement, he waives, that is, gives up, the right to a trial;

(e) because this plea is entered pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), the defendant understands that he may not withdraw his guilty plea even if the Court does not accept the sentencing recommendations of the government or his counsel;

(f) that, upon entry of a plea of guilty, or thereafter, the Court may ask him questions about the offenses to which he has pled, under oath, and that if he answers these questions under oath, on the record, his answers may later be used against him in a prosecution for perjury or false statement if an answer is untrue;

(g) that he agrees that the plea agreement is voluntary and not a result of any force, threats or promises apart from this plea agreement;

(h) that he reads, speaks, writes and understands English;

(i) that he has read this agreement, and he fully understands it; and

(j) the defendant is satisfied with the representation of his lawyer and feels that his lawyer has done everything possible for his defense.

19. This plea agreement states the complete and only agreement between the United States Attorney for the Districts of Guam and the Northern Mariana Islands and the defendant, supersedes all prior understandings, if any, whether written or oral, and cannot be modified other than by a writing that is signed by all parties or is on the record in Court. No other promises or inducements have been or will be made to the defendant in connection with this case, nor have any predictions or threats been made in connection with this plea.

DATED: 3/26/13

RAMACHANDRAN VADIVELLU
aka VIC RAAMA aka VIC RAAMA SARADA
Defendant

DATED: 3/26/13

JOHN GORMAN
Attorney for Defendant

ALICIA A.G. LIMTIACO
United States Attorney
Districts of Guam and the Northern Mariana Islands

DATED: 3/26/13

ROSETTA L. SAN NICOLAS
Assistant U.S. Attorney

DATED: 3/26/13

STEPHEN SINNOTT
First Assistant U.S. Attorney